The plaintiff is Eugene Perez for the Appellant Daicel Corporation. Unless the court objects, and given the number of issues, I'd actually like to talk about the motion to amend first, which is, we believe, Schneidt was improperly denied. And then I'll move on to the anticipation round, the original round three for original Claim 11. Well, you've disclaimed Claim 1, right? Yes, that's right, Your Honor. So, all you're arguing is Claim 11? Yes, but every claim is distinct from each other, it's own invention, right? Claim 11 includes all the features of Claim 1. Disclaimer of Claim 1 is definitely not a disclaimer of Claim 11. And what is it in Claim 11 that is distinctive and non-obvious over the prior op? Claim 11 just refers to hydrogen iodide concentrations, right? So we're going to go with, so I guess we're going to talk about anticipation first. So the idea here is that Claim 1 was disclaimed, there was another reference out there that basically was anticipatory. Now what we have here is a different reference, and so the perspective is, does Meyer anticipate all features of Claim 11, which of course includes the features of Claim 1, and that comes down to the combination of methyl acetate and water. And so the perspective is, does Meyer anticipate Claim 11, including the methyl acetate concentration? At page 3 of the Red Brief, Selanese contends that Dicelle argues for the first time on appeal that Meyer's reaction mixture differs from its liquid reaction composition. Are they correct that this wasn't raised? I believe that that is not the case, and we do brief that. In fact, this issue came up during the oral hearing before the board. It came up, and we've had it in our declaration, which of course was never cited. That's, for example, at paragraph 55 of our expert, and that's... What's your appendix? Appendix 2823. I mean, besides the nomenclature of liquid reaction composition, if you look at column 5, and we've argued this, it has other key terms such as reactor or carbonylation reaction. So the reason why we've argued the mixture in a reactor is different than any other mixture or composition going downstream, coming out of the reactor. This is fully brief, and one thing I would like to note is that in column 5 we believe any of these patents, acetic acid patents, they usually go chronological order. They talk about the reactor first, which is what's column 5. Going to column 6 and on, it goes to the flasher, to the distillation columns, and then to the final purified product of the acetic acid. Column 5, we've always argued that's a different composition in the reactor. That is where the methanol and carbon monoxide is added. There's no acetic acid even made yet. That's where methyl acetate and water is added. And in fact, to get a full understanding of my error, if you go to columns 3 and 4, they talk about the present invention, and that present invention is a certain amount of hydrogen iodide and less than 5% of water. Column 5 talks about as much as 14% of water. How's that consistent? It's not. So when you look at it, if you look at the briefings, the appellate and the judges never talk about columns 3 and 4. They never define what is the present invention. The present invention is also mentioned in column 6. The present invention is the low amount of water. There's 14% water listed at column 5. That's because they're talking about what's in the reactor. That's not the distillation column. Counsel, this is a process for producing acetic acid comprising distilling a mixture, which is what's in the mixture. And since you've disclaimed claim 1, isn't that essentially in the prior art? I would disagree. No, because when you talk about all... Claim 11 can't be taken out of context. Why did you disclaim it if it wasn't in the prior art? Unpatentable. The OB reference was original ground 1. We believe it had a working example that fell within the scope. Yes. Restate that? There was an OB reference in original ground 1. It was just the reason why we disclaimed claim 1. But that's a different reference. What we're talking about is MIURA. I see. I see. You're saying MIURA doesn't disclose it, but another reference does. No. OB does not... OB was never at issue with claim 11. So basically, the claim 11 was never issued in ground 1 and 2. Ground 3 is what's on appeal. And of course, what we're talking about only is claim 11, which adds the hydrogen iodide concentrations, which are in MIURA. Those concentrations are in MIURA, right? Yes. But MIURA also does not describe the claim combination of the effective amount of water and methyl acetate. This is anticipation, not obviousness here. Anticipation requires that the prior art reference, the single reference, discloses all claim features. This is why we're on appeal. We believe it does not. The disclosure of methyl acetate in column 5 has nothing to do with the distillation. Let me read you something that I want to answer to your concerns. On page 8 of the red brief, first full paragraph, the 483 patent claims do not recite the entire process for making acetic acid. Instead, they're limited to just one aspect of the process, distilling a mixture containing the products of the carbonylization reaction to purify acetic acid. Let me say this. The claim processes thus do not actually require one to perform the carbonylation reaction, a flash separation step, or any subsequent purification steps after the first distillation. Is that true? I think it's important. If you look at claim 1, which claim 11 depends on claim 1, it does talk about distilling. We do not claim the carbonylation reaction system. That is correct. We do not require a flasher step. That is in the substitute claims 16 through 18. But we're still claiming distillation of certain amounts of chemical components. That's missing in the prior art reference. If you want to come down to claim interpretation, yeah, we're not claiming what's in the reactor. We're not claiming anything after the first distillation. Well, we do claim to condensate. Because what happens, the reason why there's an invention here is that when you boil off the components and go to condensate, there's basically a more purified product based on the concentration of water and methyl acetate in the distillation column. I'm kind of running out of time. Motion to amend is a completely different topic here, so I'll go to the motion to amend if you don't have any more questions on the anticipation. So the motion to amend has to do with the substitute claim 16. And 18.16 has a lot more features, has a lot more steps. The obviousness rationale is MIURA, example 1, combined with xenobiol. I don't know if I'm pronouncing that correctly. But xenobiol, it has this paragraph 48. Now, if you look at the way the board framed the rationale, they never looked at anything else in the reference. And an obviousness analysis, of course, takes the grand factors, ascertaining the scope and content of the prior art. You can't just take a single sentence or two out of a prior art reference. It's taken out of context. So when you look at xenobiol and you talk about what their citing is, it teaches methyl acetate with respect to phase separation. But if you read beyond paragraph 48, 49, table 1, or before that, xenobiol has a different problem, a different solution, and methyl acetate is used completely differently. Here, we're talking about methyl acetate affecting liquid-liquid separation. Could the PTAB believe Selonese is expert? He testified, xenobiol, therefore, teaches to one of ordinary skill in the art that problems with single phasing can be resolved by reducing methyl acetate concentration. Yes, but, I mean, there's a couple problems with that. First of all, where does the problem originate from? That's not disclosed in my art. That's not disclosed in xenobiol. And besides that, the expert never talks about any other parts of xenobiol. Only 48. Carefully chosen. Because if you went beyond that, you'll see that methyl acetate is actually disclosed in a different sense. In fact, to make it a simple analogy, if you put oil and water in a vessel, and after time you'll see phases separation, right? You'll see liquid-liquid. But if you boil it, and you start to have a vapor, that's what's going on in distillation column. That's separate. That's a totally different idea, totally different concept of phase separation, of my era, or dimension, versus what's in xenobiol. So we think, first of all, the whole teaching of xenobiol is not even considered. It was carefully chosen, just one paragraph. And second, it's basically taken out of context. And we have evidence of record. We have declarations of record that contest exactly what they do. What do you mean by basically taken out of context? Because the way methyl acetate is described in xenobiol is for a different type of separation. And the goal of xenobiol is to get rid of permanganate-reducing compounds. They do that by using a second distillation column. And in there, that's where they talk about methyl acetate. And in fact, when the methyl acetate is present, they prefer 0% acetic acid. That's very inconsistent with what's going on in my era. Scientifically, it's inconsistent. It's not what one person or a skilled neurologist would actually do. They would not interpret how methyl acetate is used in xenobiol, and then somehow apply it to change the 9.8% in my era down to 9. Do you disagree that Selenis is expert as a person of skill in the art? I don't necessarily disagree. What I do disagree with is how they only analyzed a certain part of the prior reference and ignored the rest of it. So, I mean, I'm not going to argue that the person is not an artist of skill in the art. What I'm arguing is, was all evidence considered? And that comes down to our declarations. Basically, when we talk about the motion to amend, they cannot account for the amount of acetic acid in one of the phases. So this is when they said, my era's example one corresponds to our patent compared to example three. Well, they cite paragraph 77 of our expert, but first of all, that's taken out of context. We said, if anything, da, da, da. And also, we're only talking about methyl acetate in that paragraph. That paragraph is taken out of context, but probably more importantly is... What they said is, my era's example one of 9.8 weight methyl acetate would correspond to comparative example three of the 483 patent spec of 10 weight, 10% weight. Yes. Yes. And, but the board's rationale is, they're saying there's a link between those two and they rely on our paragraph 77. But there's no other citations to our declaration whatsoever. The only time they cite to our declaration is basically out of context and against us. So how do we... Counsel, you're into your rebuttal time. Why don't we save it, give you three minutes of rebuttal, and we'll hear from the other side. Mr. Collins Chase. May it please the court. DICEL raises only factual challenges to the board's findings here, which are supported by substantial evidence. I'd like to note from the beginning that there's no inconsistency in the Miura reference. Miura describes basically the same process, and it discloses that there is a distillation that can be done on the liquid reaction composition. As counsel has stated, the present invention is the low amount of water. So the reference, and this is column six, line 30 of the Miura reference, says you can do the present invention on the liquid reaction composition. The board correctly interpreted that, and supported by Mr. Innekamp's testimony, that that meant the low water distillation process on a composition that also had the claimed amount of methyl acetate. That's all that's required for anticipation, and the board was entitled to credit Salonita's expert and did so here. As to the difference between Claim 1 and Claim 11, they did not raise any separate distinctions based on Claim 11, and seemingly conceded that Claim 1 was in the prior art by canceling the claim rather than maintain it during the proceedings. Claim 1 purports to be a process for producing acetic acid from a mixture that contains acetic acid, which consists of distilling it and condensing it, and then determining what the concentrations are of various components. That's correct, Your Honor. And Claim 11, which they, again, did not argue separately for any additional limitations, simply adds another well-known compositional element that's also disclosed identically in the Miura reference. Dysel's primary argument, just to address the waiver point, we don't need to get to waiver. The primary argument for the board was that you wouldn't do distillation without flashing. Mr. Henningkamp testified that his reading of the Miura reference was that you could, and the board credited his testimony in that regard. That's substantial evidence supporting the board's interpretation. As to the amended claims, the board made separate findings on the methyl acetate concentration for the amended claims. It first stated at Appendix Page 26 that it was a finding that the Miura reference discloses distilling a mixture with the claimed amount of methyl acetate for the same reason that it had determined with regard to anticipation. In other words, it's the same claim element the board found for the same reason that it was present in the reference. The board went on, however, to analyze the Znobel reference and said Znobel takes a well-known problem, phase separation in the overhead of a column, and it tells you that where you have that issue, you can address it by reducing methyl acetate concentration. What they did is they took the example from Miura of 9.8% by weight and simply reduced it to within the claim range. And I would note that within the claim range is, again, the more preferred range of Miura, which discloses 0.5% to 6% by weight as the more preferred range. So Znobel didn't have to take you very far, and indeed it only had to take you into what Miura already taught, was the preferred range for methyl acetate. So that reference is just additional support for the board's determination, and so we would argue that the board's obviousness determination is correct based on substantial evidence supporting that factual finding. And finally, as to the other concentrations, the testimony that the board credited was from Mr. Henningkamp again. He stated that the concentrations were broad ranges that were well-known in the art and that there was nothing new or inventive about them. This is his testimony in Appendix 2276, and he said, as a result, in my opinion, there's nothing new or inventive about the compositional ranges now being claimed in Proposed 16. And indeed, Dysel doesn't even argue most of the elements that they've added to Claim 16. The claim's about a page and a half long, and they've only argued one additional claim element. The reason for that is that what Claim 16 does is it takes the well-known Monsanto process from the 1960s with some modern updates that are disclosed in the prior art, and it simply describes every single aspect of that process from top to bottom. All of those elements are well-known in the prior art, and that was what Mr. Henningkamp's testimony was on the amended claims. And for that reason, the board correctly found the elements disclosed and correctly held that the claims would have been obvious and rejected them. Thank you, Counsel. No one ever loses points for not using all their time. Thank you, Your Honor. Mr. Perez has a little time. Three minutes. Okay, so what we heard was that we're contesting factual findings, but I would think substantial evidence means considering all the evidence, including our declaration. And if you look at the final written decision, how do they even consider it? I mean, there's nothing like to say Petitioner has experts saying, has Statement A, and Pat owner has Statement B in direct contrast to A. Oh, but Petitioner cites a textbook as objective evidence, thus we're persuaded by Petitioner. There's nothing like that in there. The only time they cite our declaration is Paragraph 77, out of context, against us. So we're left wondering, like, what exactly happened? Where's the evidentiary basis for these factual findings? Also, we are contesting a factual finding in the sense that you're going against the literal... The factual basis is they rely on your friend's expert. My friend's expert? On the other side's expert. Yeah, but there's no analysis whatsoever of our declaration. The reasoning, if you look at the analysis section, there's never a citation of any of our paragraphs of our lengthy declaration. The only time they cite is against us. So we don't know what the evidentiary basis is. And as far as the factual findings go, if there's a literal description of methyl acetate in the reactor, in Meyer, or if there's a literal description of methyl acetate in Zenoble that's in the context of a different vessel and a different separation, then how is that substantial evidence when you're going against the literal disclosure of the prior reference? We're in the law, as it says, that a trier fact, finder fact, has to... If they rely on witness testimony, that they have to refute other witness testimony, they can just choose not to believe it. That's... There's nothing in the law that says that. But, again, we're... As counter, we're wondering, like, how was our declaration considered? How was it weighed? When we have statements in direct contrast to what their declarant said. If you read the following decision, it's void of that kind of analysis. And that's the problem we have with this. We don't know if you're going to do a factual finding, that's fine. You could have said, we believe this declarant more because they cite this objective evidence or something like that. There's nothing like that. And as far as... Again, obviousness is a legal conclusion, that's reviewed de novo. I know there's factual underpinnings, but, of course, is the legal conclusion correct when maybe the reference was not considered in the right context? And that's de novo and MIRA. And they point, again, to the preferred range at column 5 in MIRA, but it's 9.8. That's outside the preferred ranges. And the inventive example and comparative example is also at 9.8%. So, how is there a criticality teaching of methyl acetate? Methyl acetate doesn't appear in any of the claims of MIRA. So, again, we're left with the combination of de novo and MIRA. And I see my time is up. Thank you, counsel. The case is submitted. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock AM.